577 F.2d 968
 Grover HARRISON, Plaintiff-Appellee,
v.
FLOTA MERCANTE GRANCOLOMBIANA, S. A., Defendant-Third-Party
Plaintiff-Appellee,
JAMES J. FLANAGAN STEVEDORES, Third-Party
Defendant-Fourth-Party Plaintiff-Appellee,
v.
ROHM AND HAAS COMPANY, Fourth-Party Defendant-Appellant.
 No. 76-2822.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 7, 1978.
 
 John T. Golden, W. Ronald Robins, Houston, Tex., for fourth-party defendant-appellant.
 John P. Forney, Jr., Houston, Tex., for J. J. Flanagan Stevedores.
 Herman Wright, Houston, Tex., for G. Harrison.
 Frank E. Caton, Houston, Tex., for Flota Mercante, etc.
 Appeal from the United States District Court for the Southern District of Texas.
 Before TUTTLE, GEE, and FAY, Circuit Judges.
 FAY, Circuit Judge:
 
 
 1
 On June 29, 1971, the plaintiff, Grover Harrison, was employed by James J. Flanagan Stevedores as a longshoreman aboard the freighter M/V Ciudad De Pasto, of Colombian registry and owned by Flota Mercante Grancolombiana, S.A. The freighter was moored at City Dock No. 4 in Houston, Texas, and was receiving cargo for shipment to Colombia. At approximately 2:15 p. m., a load of six 55 gallon barrels of the liquid chemical isobutyl acrylate (IBA)[1] was being loaded into the forward end of hatch number one by the vessel's forward winches and booms. During the loading the forward winch slipped and the load struck the hatch coaming, causing two of the barrels to fall into the hold, striking at least one other barrel. The actual falling of the barrels did not injure anyone, but the damage to at least three of the barrels caused substantial leaking, quickly filling the hold with the IBA fumes. The plaintiff thereafter descended into the hold as part of a clean-up crew and he took the initiative in removing the ruptured barrels and covering the spilled liquid with straw and sawdust. While in the hold, the plaintiff inhaled IBA fumes and the liquid splashed upon his clothing. The plaintiff experienced burning and stinging of the eyes and skin, as well as a sore throat and a headache. No special safety equipment was made available to the plaintiff.
 
 
 2
 The plaintiff returned to the dock following the clean-up efforts and remained on the job for approximately two or three hours, at which time he received a medical ticket entitling him to medical treatment. The plaintiff was unable to shower or to change clothes until returning to the union hall several hours later. During the ensuing five or six weeks, the plaintiff remained on the job but experienced a worsening condition of shortness of breath, itching and burning of the skin, and headaches. He then became seriously ill and is now totally disabled. Prior to June 29, 1971, the plaintiff was an able-bodied longshoreman who worked on a regular basis with no appreciable medical difficulties. The plaintiff's condition is diagnosed as diffuse pulmonary fibrosis and emphysema.
 
 
 3
 The plaintiff instituted this action against Flota Mercante Grancolombiana, S.A., the owner of the vessel, alleging negligence and unseaworthiness. The action was designated as one "within the admiralty jurisdiction of this Honorable Court as that term is defined by Section 9(h), Federal Rules of Civil Procedure." The owner then impleaded James J. Flanagan Stevedores, the plaintiff's employer, alleging that the unseaworthiness of the vessel, if any, was due to the employer's negligence.[2] The employer in turn filed a fourth-party complaint against Rohm and Haas Company, the shipper of the IBA, seeking indemnification based upon product liability and negligent failure to warn of the dangerous propensities of IBA. The vessel owner then asserted a claim against the shipper, and the plaintiff also amended his complaint to state a claim against the shipper alleging product liability and negligent failure to warn. The plaintiff again specified in his pleading that the action was within the admiralty jurisdiction of the court within the meaning of Rule 9(h), Fed.R.Civ.P.
 
 
 4
 On May 17, 1976, the trial court awarded judgment for the plaintiff solely against Rohm and Haas, the fourth-party defendant, in the amount of $264,695.66 plus interest at the rate of 6% from June 29, 1971, the date of injury.[3] The court concluded that the vessel was unseaworthy and that the unseaworthiness caused the plaintiff's injury. However, liability was visited solely upon Rohm and Haas because the court concluded that neither the vessel owner nor the stevedore was actively negligent, and that the active negligence of Rohm and Haas in placing an inadequate warning on the barrels was the cause of the plaintiff's injury. The court held, alternatively, that the evidence adduced warranted the classification of IBA as a "Class B" poison under the Coast Guard regulations,[4] and, because the shipper failed to label the barrels accordingly and to specify the cargo as dangerous on the cargo manifest, the shipper was negligent per se and hence liable for the injury sustained by the plaintiff.
 
 
 5
 Rohm and Haas urges several contentions in support of its position that the judgment of the trial court is due to be reversed. It argues that the trial court was clearly erroneous in finding (1) that the plaintiff's condition was caused by exposure to IBA (2) that the warning given was inadequate (3) that the plaintiff's employer was not actively negligent in the conduct of the winch and clean-up operations (4) that IBA is a Class B poison, and (5) that the plaintiff is entitled to $60,000 in damages for future medical expenses. Rohm and Haas asserts that even if the warning was negligently inadequate, the improper warning was not the proximate cause of the injury because the plaintiff did not read the warning and would not have read a more complete warning. Finally, Rohm and Haas contends that it was deprived of the right to trial by jury and that the trial court erred in awarding pre-judgment interest.
 
 
 6
 We have concluded that the findings of the trial court on the issues of injury causation due to exposure to IBA, inadequacy of the warning,[5] and amount of compensable future medical expenses are not clearly erroneous. We further conclude that the trial court did not commit error in denying the demand of Rohm and Haas for a jury trial nor in awarding pre-judgment interest. We have concluded, however, that the finding of the trial court that the stevedore-employer was not actively negligent is clearly erroneous, and, accordingly, this case must be remanded for further factual findings consistent with this opinion.
 
 I. FINDINGS OF FACT
 
 7
 Our review of the trial court's findings of fact must be limited to the determination of whether the findings are clearly erroneous, according deference to the opportunity of the trial court to hear the witnesses and to judge their credibility. Fed.R.Civ.P. 52. A factual finding is clearly erroneous only if we determine that, after reviewing the entire record, and even though there may be evidence to support the finding, we are left with the firm and definite conviction that a mistake has been committed. Mercer v. C. A. Roberts Co., 570 F.2d 1232, 1236 n.5 (5th Cir. 1978); Golf City, Inc. v. Wilson Sporting Goods Co., Inc., 555 F.2d 426 (5th Cir. 1977). With this standard in mind, we shall discuss each of Rohm and Haas' contentions separately, setting forth the relevant testimony which was before the trial court on each issue.
 
 
 8
 The trial court found that immediately after the rupture of the barrels, the plaintiff descended into the hold where he remained for approximately one hour. The liquid was spilled onto the plaintiff while he attempted to remove the barrels, and because the hold was filled with the fumes the plaintiff naturally inhaled IBA fumes while performing the work. Supp.R.Vol. III, 481.[6] The court found that the exposure to IBA caused the emphysema and pulmonary fibrosis which disabled the plaintiff shortly after the incident in question.
 
 
 9
 On the issue of causation, the plaintiff introduced the testimony of Dr. David Mailman and Dr. Eric Comstock. Dr. Mailman, a physiologist,[7] testified to the possible chemical reactions which may take place in the body due to exposure to IBA. In particular, Dr. Mailman testified concerning the thin and fragile nature of lung tissue and the effect upon the respiratory system which may result when IBA reacts with the proteins, fats, and amines found in the cells which comprise the lung. Basically, the testimony reveals that inhalation of IBA may destroy the structural integrity of the cell membrane, causing the cell to die. He concluded that such reaction will produce scar or fibrous tissue and the resulting symptoms exhibited by the plaintiff. The testimony further reveals that the length and nature of exposure may be a significant factor in determining the effects upon the human body. Dr. Mailman admitted that there is a lack of scientific literature on the effect of IBA exposure on human tissue, that he had never examined the plaintiff, and that he has no expertise with acrylates or with the causes of pulmonary fibrosis. He did testify, however, that he had studied the plaintiff's medical records and history, as well as informational pamphlets supplied by Rohm and Haas and by Dow Badische, the manufacturer of the IBA.
 
 
 10
 Dr. Comstock, a toxicologist,[8] testified that IBA may be extremely harmful to humans when inhaled or when exposed to the skin. Comstock testified that IBA may pass through skin tissue and pass to the lungs, a target area for toxic substances. Comstock likewise testified that the level of exposure would be a significant factor bearing upon the degree of damage to the lung tissues. After tracing the plaintiff's medical history, Dr. Comstock concluded that there is a causal relationship between the plaintiff's exposure to IBA and his condition at the time of trial. Dr. Comstock acknowledged that he has no particular expertise with IBA and has never worked with it, that his medical research revealed no connection between IBA and pulmonary fibrosis, and that he had never examined the plaintiff. Comstock's testimony was based solely upon the plaintiff's medical records and the chemical formula of IBA.
 
 
 11
 Dr. Ben Walpole, the plaintiff's personal physician prior to the incident, was called by the third-party defendant, James J. Flanagan Stevedores. Dr. Walpole testified that the plaintiff's disease is a common disease of which there are many causes and that he believed that the plaintiff's condition existed to some extent prior to June 29, 1971. On cross-examination, however, he admitted that on prior occasions he diagnosed that the plaintiff's condition was caused by toxic pneumonitus or from the toxic effect of the inhalation of IBA. He further admitted that there was nothing specific in the plaintiff's medical history to which the disease could be attributed and that he is unable to deny that the exposure to the IBA "contributed materially" and was a "substantial factor" of the plaintiff's condition. Supp.R.Vol. II, 361, 362.
 
 
 12
 Rohm and Haas countered with the testimony of Dr. Harris Bush and Dr. Daniel Jenkins. Dr. Bush, a pharmacologist,[9] testified to the high incidence of pulmonary fibrosis found in Houston, Texas, and that in about 75% of the cases the exact cause is never determined. Dr. Bush further testified that it is "medically unreasonable" to find that exposure to IBA caused the plaintiff's disease due to the absence of immediate symptoms, as well as the absence of skin burns, indicating no actual skin absorption. Dr. Bush also indicated that in 1970 the plaintiff had taken the drug macrodantin and that medical literature reveals more than 100 cases of pulmonary fibrosis resulting from an adverse reaction to the drug.
 
 
 13
 On cross-examination Dr. Bush admitted that he had earlier agreed with the interpretation of Dr. Longley, a radiologist, who examined the plaintiff's x-ray charts shortly after the incident in question. Dr. Bush agreed that "acute toxic inhalation cannot be excluded," that "the changes could possibly be the result of inhalation of toxic substances," and that the October, 1971, x-ray revealed "scarring fibrosis, early fibrosis." (emphasis added). Supp.R.Vol. V, 1342-1345.
 
 
 14
 Dr. Jenkins is the head of the pulmonary disease section at the Baylor College of Medicine and Chief of the pulmonary disease service of the Harris County Hospital District. Dr. Jenkins hospitalized the plaintiff in 1974 and conducted extensive diagnostic tests. Dr. Jenkins likewise testified that in his opinion the plaintiff's condition was not caused by exposure to IBA and that a more reasonable explanation of causation is the plaintiff's years of occupational exposure to other fibrosis causing agents such as carbon black and grain dust, combined with the plaintiff's allergic tendencies. Dr. Jenkins also testified that the 1970 exposure to macrodantin and smoking were possible causes of the plaintiff's disease.
 
 
 15
 On cross-examination, Dr. Jenkins admitted that the plaintiff's condition is idiopathic, that is, he cannot point to a specific causative agent. Dr. Jenkins further admitted that tests conducted by Dr. Walpole in 1971 to measure the level of eosinophil in the blood and sputum tend to undermine possible allergic causes and that he was not aware of the extent of the plaintiff's exposure to macrodantin in 1970. More significantly, the record reveals inconsistencies in the testimony of Dr. Jenkins that the plaintiff's condition predated June 29, 1971. Dr. Jenkins acknowledged that there are three recognized stages of interstitial fibrosis, the "early stage," the "immediate stage," and the "chronic stage." Dr. Jenkins admitted that it would be quite significant to ascertain the stage to which the plaintiff's condition had progressed in 1971, following his exposure to IBA, in order to determine the date of onset of the condition. He further testified that "digital clubbing", clubbing of the fingers, exhibited by the plaintiff in 1974 revealed that the plaintiff's disease had then progressed to the chronic stage. Dr. Jenkins then admitted that the report of Dr. P. O. Jones, who examined the plaintiff in 1971, does not record any finding of digital clubbing.[10] Finally, Dr. Jenkins admitted that an interpretation of the biopsy slides taken from the plaintiff in 1971, subsequent to the incident in question, are consistent with an early stage of interstitial fibrosis.
 
 
 16
 Our thorough study of the expert testimony outlined above necessarily leads to the conclusion that the finding of the trial court that exposure to IBA caused the plaintiff to contract pulmonary fibrosis and emphysema is not clearly erroneous. It is not our duty or right on appeal to sift through the evidence and determine whether we would have drawn the same inferences as did the trier of fact and would have resolved credibility determinations in a like fashion. The evidence reveals that the plaintiff, a relatively healthy forty-nine year old longshoreman with many years of experience on the docks, was exposed to IBA and shortly thereafter became permanently and totally disabled. The plaintiff presented credible expert testimony supporting his theory of causation. The defendant, Rohm and Haas, presented well-qualified experts who pointed to several possible causes, including exposure to IBA, but who could not point to a specific causative agent. All of the experts agreed that the medical literature is barren of empirical data concerning the effects of IBA exposure on human beings. We refuse to examine the evidence de novo and to conclude therefrom that the defendant's experts are more credible than the plaintiff's or have proffered a more reasonable explanation or explanations of the possible causes of the plaintiff's disease. This simply is not our role under the clearly erroneous standard. The trial court has determined that the preponderance of the evidence establishes that exposure to IBA caused the plaintiff to contract pulmonary fibrosis, and this conclusion is certainly supported by credible evidence in the record. We are not firmly and definitely convinced that the trial court committed error. Hence, the trial court's finding is not clearly erroneous.
 
 
 17
 The defendant Rohm and Haas next contends that the trial court was clearly erroneous in its finding that it negligently failed to warn of the dangers inherent in the handling of IBA. The court found that Rohm and Haas negligently failed to give a reasonable and adequate warning of the dangers of IBA, and second, that Rohm and Haas negligently failed to provide instructions concerning the procedure to be followed in the event of a major spill. R.Vol. III, 497. The barrels of IBA contained the following printed warning, in non-distinctive type:
 
 
 18
 WARNING. MAY CAUSE SKIN IRRITATION. AVOID CONTACT WITH SKIN, EYES, AND CLOTHING. IN CASE OF CONTACT, IMMEDIATELY FLUSH SKIN, EYES WITH PLENTY OF WATER FOR AT LEAST FIFTEEN MINUTES. FOR EYES, GET MEDICAL ATTENTION. IF SWALLOWED, VOMITING SHOULD BE INDUCED AND PHYSICIAN CONTACTED. USE WITH ADEQUATE VENTILATION. AVOID PROLONGED BREATHING OF VAPOR.
 
 
 19
 Before examining the evidence presented on the issue of the adequacy of the above warning, it is necessary to set forth the controlling legal principles concerning the nature of the shipper's duty to warn. We feel that the rights and duties of the parties in the case at bar are to be determined according to the general principles of federal maritime law because the plaintiff was injured prior to the 1972 amendment of 33 U.S.C. § 905 while performing work bearing a significant relationship to traditional maritime activity on a ship moored on navigable waters.[11] General maritime law incorporates the general law of torts when not inconsistent with the law of admiralty, Spinks v. Chevron Oil Co., 507 F.2d 216, 222 n.8 (5th Cir. 1975), and, as we recognized in Alcoa Steamship Co. v. Charles Ferran & Co., 383 F.2d 46, 50 (5th Cir. 1967):
 
 
 20
 . . . even though admiralty suits are governed by federal substantive and procedural law, courts applying maritime law may adopt state law by express or implied reference or by virtue of the interstitial nature of federal law. (footnote omitted).
 
 
 21
 In any event, choice of law is irrelevant on the warning issue because we feel that general maritime law will apply the same rule as is applied in the Texas courts,[12] namely, that the seller of a product is only under a duty to warn of those dangers which are reasonably foreseeable and of which the plaintiff cannot reasonably be expected to be aware. See Martinez v. Dixie Carriers, Inc., 529 F.2d 457, 464 (5th Cir. 1976); Petition of Kinsman Transit Co., 338 F.2d 708, 724 (2nd Cir. 1969). The seller or supplier must exercise reasonable care to inform those who may use or come into contact with the product of its dangerous propensities. 529 F.2d at 465. This duty extends to longshoremen who assist in transporting the product to its ultimate intended use. See Simpson Timber Co. v. Parks, 390 F.2d 353 (9th Cir. 1968).
 
 
 22
 The trial court concluded that Rohm and Haas was aware of the possible deleterious consequences of inhalation of IBA fumes, that neither the plaintiff, the stevedore, nor the shipowner could reasonably be expected to be aware of the danger absent adequate warning, and that the warning actually given was negligently inadequate. We have detailed below the physical evidence and testimony supporting the trial court's findings.
 
 
 23
 The plaintiff introduced informational pamphlets published by Rohm and Haas and Dow Badische, the manufacturer. In Rohm and Haas' "Special Products Department" bulletin it is stated that:
 
 
 24
 Information on the toxicity of isobutyl is not available, but it is reasonable to assume that the compound is a moderate toxic material like other acrylate esters . . . . It may be stored and handled safely by properly trained personnel using suitable equipment and following established safety practices. (emphasis added).
 
 
 25
 Plaintiff's Exhibit 19A, 1.
 
 
 26
 Rohm and Haas stated in its brochure entitled "Storage and Handling of Acrylic and Methacrylic Esters and Acids" that "No data are available on the effect of vapors; precautions should be taken to avoid undue exposure to vapors until specific data are reported. . . ." Plaintiff's Exhibit 19B, 6. The following excerpt can be found in Dow Badische's brochure entitled "Acrylic Monomers," of which IBA is a member:
 
 
 27
 . . . concentrations of vapors of butyl acrylate capable of causing serious systemic injury, even death, are also obtainable under the usual industrial handling conditions, but the exposure time necessary for the production of these effects is somewhat longer than that necessary for the methyl and ethyl acrylates . . . . Avoid breathing vapors of acrylic acid. Work in a well ventilated area. A full gas mask should be available for cleaning up spills and for use in confined areas . . . . All personnel working in areas where monomeric acrylic esters or their vapors may be present should be thoroughly indoctrinated on the properties and potential hazards of these products . . . . A recommended procedure for handling spillage would be:
 
 
 28
 1. Assign trained personnel with the proper personal protective equipment to clean up . . . .
 
 
 29
 5. Provide maximum ventilation, obtainable until area is cleaned up . . . . (emphasis added).
 
 
 30
 Plaintiff's Exhibit 19A, 31-33. The testimony of Dr. Mailman that IBA is more toxic than butyl acrylate, referred to above as capable of causing "serious systemic injury, even death," was uncontradicted. Supp.R.Vol. II, 508-509. Nor did Rohm and Haas dispute that it was aware of the Dow Badische brochures at the time of the injury in question. Dr. Mailman testified that in view of the danger of exposure to IBA which any inhalation may engender, as the above literature indicated, the warning provided by Rohm and Haas was negligently inadequate. Dr. Mailman opined that the warning should warn against any breathing of IBA vapors.[13]
 
 
 31
 Rohm and Haas attempted to establish at trial that the warning given was reasonable in light of the foreseeable dangers involved. Dr. Charles Dernehl, associate medical director for Union Carbide Corporation, another manufacturer of acrylates, testified on behalf of Rohm and Haas. He testified that in his opinion, IBA is not particularly toxic to man and only dangerous if ingested in large quantities. He further testified that he has never received a complaint concerning the effects of the use of IBA.[14] On cross-examination, however, Dr. Dernehl admitted that "this label would be a little deficient in that under the warning statement it does not include a caution about breathing of vapors." Supp.R.Vol. IV, 1046. Dr. Dernehl further admitted that the warning "tends to play down a little bit the probable hazard by inhalation." Id. at 1047. Dr. Dernehl testified that the Union Carbide warning is on a separate paper label that is stuck onto the drum and is distinctive from whatever stencilling there might be on the drum. Finally, Dr. Dernehl admitted that the word "prolonged" is a "fudge" word when used in the warning "Avoid Prolonged Breathing", as in the case at bar.
 
 
 32
 The remainder of the testimony presented by Rohm and Haas on the issue of foreseeable danger and sufficiency of the warning came in the form of testimony of employees who testified to the lack of harmful effects from exposure to IBA during the manufacturing process. Rohm and Haas pointed additionally to the lack of medical literature on the harmful effects of exposure to IBA to support the sufficiency of the warning given.
 
 
 33
 We simply cannot conclude from our review of the foregoing evidence that the trial court was clearly erroneous in its findings that the warning provided by Rohm and Haas was inadequate and negligent in view of the foreseeable risks. There is an abundance of evidence to support the trial court's conclusion that Rohm and Haas was negligent in only warning against " prolonged" breathing. The trial court also made detailed findings, based upon the record, that neither the plaintiff's employer nor the shipowner could be expected to know of the actual danger involved from the inhalation of IBA in the absence of adequate warning. Rohm and Haas has introduced no evidence to prove that either of the other parties knew or should have known of the actual danger involved from such inhalation. In fact, Rohm and Haas continues to contend on appeal that there is only a slight risk, if any, involved in the handling of IBA. This case is therefore clearly distinguishable from Martinez, supra, wherein we denied recovery against the manufacturer under a theory of negligent failure to warn because both the employer, Wilsco, and the employees were aware of the dangerous propensities of the liquid being used and the noxious fumes emitted therefrom which caused the death of the plaintiff.
 
 
 34
 Rohm and Haas next contends that the finding of the trial court that the plaintiff's employer, Flanagan Stevedores, was not negligent is clearly erroneous. Rohm's and Haas' attack on the findings of the trial court is twofold. It contends that Flanagan Stevedores was actively negligent in conducting the loading operation with a defective winch and in failing to provide protective clothing during the clean up operation. The court below found that " 'the winches on the vessel were reasonably safe and fit for the purposes of intended use' " and that "(t)he stevedore acted in a reasonable and workmanlike manner commensurate with the information it had received from the shipper and the warning labels on the drums of IBA." R.Vol. III, 496, 500. We have concluded that only the finding that the winches were not defective can pass muster under the clearly erroneous standard, and, because the record is unclear on the issue of causation,[15] we hereby remand this case to the trial court for further findings of fact.
 
 
 35
 There was much conflicting testimony presented concerning the condition of the winch which dropped the barrels into the hold. Mr. Ray Williams, a Flanagan foreman who was aboard the vessel on June 29, 1971, testified that the winch was not dependable. Mr. Troy McHenry, the winchman operating the winch at the time in question, testified that the winches were "bad" and that there was too much slack in the lines. He further testified that he reported the bad winch to the foreman prior to the fall of the barrels. On cross-examination, however, McHenry admitted that in an insurance report filed shortly after the incident he failed to mention any defect in the winch. McHenry acknowledged that all winches do not act in a similar manner and that an experienced winchman can often safely operate a winch which perhaps could not be safely handled by a less experienced operator. Finally, McHenry testified that no one had called to his attention that the winch may have been defective until several years after the incident, when he first met with Mr. Forney, attorney for Flanagan Stevedores. Supp.R.Vol. III, 663. Mr. Stevenson McClendon, also a winchman aboard the vessel on June 29, 1971, testified that the winches were bad, that all winches don't operate similarly, and that the winches were difficult to operate but that he operated the winches safely. Mr. Merlin Clark, operations manager for Flanagan Stevedores at the time of the incident, testified that it was necessary to have experienced winchman operate the winch in question because it is a difficult winch to operate, but that with such a winchman the winch was perfectly fit for its intended use.
 
 
 36
 From the foregoing testimony, and after observing the demeanor of the witnesses and making credibility determinations therefrom, the trial court concluded that the winches were reasonably safe and fit for their intended use. This finding is not clearly erroneous.[16] Once again, we reiterate that it is not our function, when reviewing factual determinations made by the trial court, to determine whether we would have reached a similar conclusion. The record, as it relates to this issue, does not leave us with the firm and definite conviction that a mistake has been committed.
 
 
 37
 Our review of the record, however, does leave us firmly convinced that the trial court committed error in finding that Flanagan Stevedores was not actively negligent in failing to provide protective clothing to the plaintiff during the clean up operation. The record reveals that after the spillage occurred, and while the plaintiff was in the hold conducting the clean up operation, both Mr. Williams, a Flanagan foreman, and Mr. Clark, a Flanagan's operations manager, read the warning provided by Rohm and Haas. In pertinent part, the warning states as follows:
 
 
 38
 WARNING. MAY CAUSE SKIN IRRITATION. AVOID CONTACT WITH SKIN, EYES, AND CLOTHING. . . . AVOID PROLONGED BREATHING
 
 
 39
 Section 1504.103(a) of the Longshoremen's Health and Safety Regulations,[17] in effect on June 29, 1971, provided as follows:
 
 
 40
 When employees are handling cargo which, due to ruptured, leaking, or inadequate containers, may cause burns, skin irritation or be otherwise injurious to health, they shall be protected by suitable protective clothing.
 
 
 41
 It is clear that although the warning was inadequate to warn of the danger inherent in breathing the fumes, the warning was certainly adequate to inform Flanagan Stevedores of the threat of burns or skin irritation present when working with IBA, and accordingly, was sufficient to invoke the protection afforded by § 1504.103(a) of the federal regulations. The record indicates that the employer had actual notice of the regulation, and, in any event, the employer would certainly be charged with knowledge of the applicable law. On cross-examination of Mr. Clark, Flanagan's operations manager, the following testimony was elicited:
 
 
 42
 Q. Now, isn't it a fact that the warning warns about irritation to the skin?
 
 
 43
 A. Correct.
 
 
 44
 Q. Isn't it a fact that whenever you have three end (threat of) irritation to the skin, that that simple fact requires you under the regulation to provide protective gear immediately. Isn't that a fact?
 
 
 45
 A. Correct.Q. So it didn't have anything to do with the lack of yellow tag or poison label or skull and cross-bones or red label or white label? You allowed those men to stay down in that hold simply because they were willing to stay down there. Isn't that a fact?
 
 
 46
 A. Correct.
 
 
 47
 The failure of Flanagan to provide protective equipment in violation of the regulation after its managerial personnel read the warning constitutes active negligence and renders the vessel unseaworthy as a matter of law. See Bonura v. Sea Land Services, Inc., 505 F.2d 665, 667 (5th Cir. 1974).
 
 
 48
 Flanagan Stevedores contends that any violation of § 1504.103(a) did not cause any damage to the plaintiff because the plaintiff has not sued for damage to the skin or eyes. This contention is belied by the expert testimony in the record, which is uncontradicted by Flanagan, that skin exposure to IBA may cause pulmonary fibrosis and emphysema.[18] For this reason, and because the trial court's conclusion that the liquid did in fact spill upon the plaintiff is not clearly erroneous, it is necessary to remand this case for further factual findings to determine whether the cause of the plaintiff's injury was inhalation of IBA, skin exposure to IBA, or both. The trial court's Findings of Fact and Conclusions of Law reveal that the plaintiff inhaled the fumes and experienced skin exposure. Although the active negligence of both Rohm and Haas and Flanagan Stevedores exposed the defendant to these deleterious conditions, liability may only be imposed against the defendant or defendants whose negligence contains a causal connection to the injury.[19] It may be that on remand the trial court will conclude that the negligence of both Flanagan and Rohm and Haas contributed to the plaintiff's injury. That is, the court may determine that both inhalation and skin exposure are causal factors.[20] If that be the case, liability may be imposed against the vessel on the ground of unseaworthiness, with right of indemnity from Flanagan Stevedores and Rohm and Haas pursuant to Ryan v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), and Tri-State Oil Tool Industries v. Delta Marine Drilling Company, 410 F.2d 178 (5th Cir. 1969),[21] or against the vessel with right of indemnity from Flanagan, and directly against Rohm and Haas.[22] If liability is imposed against both Flanagan Stevedores and Rohm and Haas, the court should consider the concept of proportionate fault. See United States v. Reliable Transfer Co. Inc., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); Nutt v. Loomis Hydraulic Testing Co. Inc., 552 F.2d 1126, 1134-1135, n. 26 (5th Cir. 1977); see also, Griffith v. Wheeling Pittsburgh Steel Corp.,521 F.2d 31, 44 (3rd Cir. 1975), where Reliable Transfer was extended to a noncollision maritime case. In the event the trial court should find that only the negligence of one of the defendants caused the plaintiff's injury, the judgment entered below should run only against that defendant.[23] Of course, if the trial court is unable to determine which defendant's negligence caused the plaintiff's injury, liability must be imposed against both because the trial court has already determined that exposure to IBA caused the injury.[24]
 
 
 49
 Rohm and Haas raises two additional factual contentions. It contends that the trial court's award of $60,000 for future medical expenses was clearly erroneous. The crux of the defendant's argument on this point is that "the trial court was clearly erroneous in disregarding the testimony of Dr. Jenkins, a recognized expert in the field, in favor of that of Dr. Comstock who had no unusual knowledge or expertise to offer." Brief of Appellant at 42. We disagree. Dr. Comstock testified that the plaintiff's terminal episode would require intensive treatment. He testified that he has treated at least two thousand patients in intensive care units during the last ten years. Furthermore, the record reveals that as director of inpatient treatment at Center Pavillion Hospital Dr. Comstock bears primary responsibility for patient billings and the determination of the fee schedule. Based upon his experience, Dr. Comstock estimated future medical costs to be in the range of approximately $100,000 to $120,000. Dr. Jenkins, testifying on behalf of Rohm and Haas, estimated future medical costs to be approximately $20,000. Although we recognize that the testimony of Dr. Comstock could have been more specific, we do not feel that the trial court's award of $60,000 under the facts of this case is clearly erroneous. There is substantial evidence from which the trial court could conclude that the plaintiff's progressively deteriorating condition would require substantially more than the bare bones $20,000 estimate propounded by Dr. Jenkins, and that $60,000 would reasonably compensate the plaintiff for future medical expenditures. After hearing the testimony the trial court simply chose to accord more weight to the testimony of Dr. Comstock than to the testimony of Dr. Jenkins. As the trier of fact it had the prerogative to do so.
 
 
 50
 Second, Rohm and Haas claims that the trial court was clearly erroneous in finding that IBA may be classified as a "Class B" poison pursuant to the Coast Guard regulations[25] governing shipment of dangerous substances. If IBA may be so classified, the shipper must provide a certain type label and must supply specified information to the vessel on a dangerous cargo manifest.[26] If IBA is not a Class B poison, the shipper is prohibited by regulation from classifying it as such.[27] Because we have concluded that Rohm and Haas negligently failed to warn of the dangers inherent in the inhalation of IBA, the issue of whether IBA is a Class B poison does not control the disposition of this case. For the sake of clarity, however, we do find it expedient to briefly set forth why we believe that under the facts of this case IBA may not be properly classified as a Class B poison. Section 146.25-10 of the federal regulations governing the transportation of dangerous substances sets forth the following test for determining whether a substance may be classified as a Class B poison:
 
 
 51
 (a) Poisonous liquids or solids (including pastes and semisolids), other than Class A or C poisons, which are known to be so toxic to man as to afford a hazard during transportation, or which, in the absence of adequate data on human toxicity, are presumed to be toxic to man because they fall within any one of the following categories when tested on laboratory animals: . . . (categories omitted). (emphasis added)
 
 
 52
 (b) The foregoing categories shall not apply if the physical characteristics or the probable hazards to humans as shown by experience indicate that the substances will not cause serious sickness or death. . . .
 
 
 53
 The regulation therefore sets forth two tests for determining whether a substance may be classified as a Class B poison, satisfaction of either being sufficient. There must be either:
 
 
 54
 (1) data on human toxicity, or
 
 
 55
 (2) data on animal toxicity.
 
 
 56
 The trial court, in concluding that IBA may be classified as a Class B poison, made the following conclusion of law:
 
 
 57
 It is the opinion of the Court that IBA falls within this classification because it was known by the shipper and other experts in the field that IBA was hazardous to health. There was evidence that data on human exposure to IBA is virtually non-existent, and that the data on toxicity to animals was not conclusive to permit such data to be used to classify IBA. Therefore, it is the opinion of the Court that IBA is a Class B poison under 46 C.F.R. § 146.25-10.
 
 
 58
 R.Vol. III, 498.
 
 
 59
 The trial court's finding is based on the published industrial standards for the use and handling of acrylates, detailed earlier, which indicate that IBA is hazardous. Additionally, the court accepted the testimony of Dr. Mailman that IBA meets the requirements of a Class B poison. R. Vol. III, 13-14. Neither the industrial standards nor Dr. Mailman's testimony, however, meets the specific tests delineated by the regulation, namely, that there be supporting data on human or animal toxicity. Accordingly, were this issue in any way central to the disposition of this case, we would hold that the record simply does not support a finding that IBA should be classified as a Class B poison.
 
 II. ISSUES OF LAW
 
 60
 A. "Proximate Cause"
 
 
 61
 Rohm and Haas contends that even assuming that the trial court was not clearly erroneous in its finding that the warning provided was negligently deficient, it can not be liable as a matter of law because the warning was not read by the plaintiff. Rohm and Haas reasons that failure to provide an adequate warning was not the proximate cause of the plaintiff's injury. At the outset, we note the historic confusion attendant with the use of the phrase " proximate cause",[28] and for present purposes feel that a proper analysis of Rohm and Haas' contention should focus upon a "cause-in-fact" analysis rather than "proximate cause". Rohm and Haas is arguing that failure to adequately warn was not the cause-in-fact of the injury because an adequate warning would not have been read by the plaintiff. Proximate cause analysis, which involves policy considerations of remoteness and limitation of liability, need only be considered after cause-in-fact has been established. Spinks v. Chevron Oil Co., 507 F.2d 216 (5th Cir. 1977). In Spinks we stated that:
 
 
 62
 The concept of proximate cause often obscures the true analysis of a tort. A court makes a policy judgment on the limits of liability when causation in fact has been established. Prosser, Torts § 42 (4th ed. 1971). This Court has applied in maritime law the legal cause analysis, as it is used in common law torts in admiralty. For example, in Watz v. Zapata OffShore Co., 5 Cir. 1970, 431 F.2d 100, we held that an independent intervening cause did not relieve a manufacturer of a defective hoist of liability, when its negligence was a substantial factor in bringing about the harm. We looked to the Second Restatement of Torts for guidance, citing Section 435(1). (footnote omitted) (emphasis added).
 
 
 63
 507 F.2d at 222. The gist of the "substantial factor" test is that "some responsibility for the effect must accompany the cause. . . ." " 'Substantial' means more than 'but for' the negligence, the harm would not have resulted, (id. Com. a) and more than merely negligible negligence."[29] Id. at 223.
 
 
 64
 Having determined that the gist of Rohm and Haas' contention concerning the plaintiff's failure to read the label brings into question the issue of cause-in-fact, we comment briefly upon the applicable law as applied to the facts of this case. Rohm and Haas relies heavily upon the Texas case of Technical Chemical Co. v. Jacobs, 480 S.W.2d 602 (Tex.1972), in support of its position that a sufficient causal relationship is lacking due to the failure of the plaintiff to read the warning. Although we are not bound to apply Texas law in the case at bar, we may look to Texas law to supplement federal maritime law if such law does not defeat the purposes of maritime law.[30] In any event, we feel that federal maritime law will adopt the view of the Second Restatement of Torts on this issue. The Restatement provides that:
 
 
 65
 Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.
 
 
 66
 Restatement (Second) Torts § 402A, comment J (1966).
 
 
 67
 Similarly, in Jacobs, supra, the Texas Supreme Court held that the jury correctly found that the manufacturer's failure to give any warning on a can of freon, thus rendering the product unreasonably dangerous, was not the "producing cause" of the plaintiff's injuries because the evidence showed that the plaintiff had not read the label before the explosion. Therefore, under the Restatement and Texas law, failure to read a label or warning may establish as a matter of law that a warning, even though negligently inadequate, was not the cause-in-fact of the injury. This is because an adequate warning would not have been read.
 
 
 68
 This rule of law, however, will in all likelihood have no application to the facts of this case. The record reveals that both Mr. Clark, Flanagan's operations manager, and Mr. Williams, Flanagan's walking foreman, did in fact read the warning shortly after the rupturing of the barrels. Williams read the warning while the plaintiff was in the process of removing the barrels and Clark read the warning minutes later, albeit after at least one of the barrels had been removed from the hold. It is the duty of these supervisory personnel to take steps necessary to protect the welfare of the employees and Rohm and Haas cannot find solace in the fact that the plaintiff did not read the warning. The trial court impliedly found that the failure of the plaintiff to read the warning was not negligent, R. Vol. III, 489, and we therefore need not deal with the issue of comparative negligence. See Wiles v. Delta S.S. Lines, Inc., 574 F.2d 1338, at 1339. The crucial distinction in this case is that someone in a position to take preventive measures, assuming an adequate warning had been given, did in fact read the warning. As we have held, the warning provided adequate notice of the need for protective clothing but negligently failed to warn of the dangers inherent in the inhalation of IBA. Therefore, if the trial court on remand determines that inhalation of the IBA fumes was a cause of the plaintiff's injury, Rohm and Haas can not be absolved of liability on the basis of lack of cause-in-fact. Rohm and Haas can be absolved only if the trial court determines that all of the damage from inhalation occurred prior to the time that the warning was read. Without making a finding on this issue, which of course should be considered on remand, we merely note that there is abundant evidence from which the trial court could conclude that the warning was read well before the clean up operation was even half completed, and that a significant exposure to inhalation of IBA fumes occurred subsequent to the time that the warning was actually read.
 
 
 69
 Rohm and Haas has made one contention bearing on the issue of causation which would traditionally fall within a "proximate cause" analysis. The contention is that even if it negligently failed to warn of the dangerous propensities of IBA, the negligence of Flanagan Stevedores in failing to provide protective clothing constitutes an independent intervening cause breaking the chain of causation and relieving it of liability. We dealt with a similar contention in Watz v. Off-Shore Co., 431 F.2d 100, 115-116 (5th Cir. 1970). After noting that it is questionable whether the doctrine of independent intervening negligence is applicable in determining causation in admiralty cases, we then refused to permit exoneration of the defendant, Eaton Yale & Towne, Inc., holding that its negligence was a substantial factor in bringing about the harm. For present purposes we need only state that Rohm and Haas cannot be relieved of liability if the trial court finds that inhalation of IBA fumes after the warning was read was a contributing cause of the plaintiff's injury. Under the facts of this case, such a holding would necessarily lead to the conclusion that the negligence of Rohm and Haas was a substantial factor in bringing about the plaintiff's injury.
 
 B. Jury Trial
 
 70
 Rohm and Haas contends that the trial court's denial of its timely demand for a jury trial deprived it of the constitutional right to trial by jury. Although the plaintiff designated his actions against the vessel and Rohm and Haas as within admiralty and maritime jurisdiction pursuant to Rule 9(h)[31] of the Federal Rules of Civil Procedure, Flanagan Stevedores cited Rule 14(a) rather than 14(c) as the basis of its indemnity action against Rohm and Haas.[32] Additionally, the actions against Rohm and Haas are predicated upon negligence and products liability, and, accordingly, may fall within the diversity jurisdiction of the district court. It is on these grounds that Rohm and Haas urges that it was entitled to trial by jury. Since the right to trial by jury is a right of constitutional dimension, we shall closely scrutinize the jury trial demand.
 
 
 71
 We traced the development of Rule 9(h) in Romero v. Bethlehem Steel Corp., 515 F.2d 1249 (5th Cir. 1975). In Romero, we made the following observations:
 
 
 72
 The unification of the admiralty and civil rules in 1966 was intended to work no change in the general rule that admiralty claims are to be tried without a jury. Fed.R.Civ.P. 9(h), 38(e) and Advisory Committee Notes. See also Moore, Federal Practice PP .59(3), 9.09, 38.35. Fed.R.Civ.P. 9(h) serves only as a device by which the pleader may claim the special benefits of admiralty procedures and remedies, including a non-jury trial, when the pleadings show that both admiralty and some other basis of federal jurisdiction exist. See 5 Wright & Miller, Federal Practice and Procedure § 1313, at 454-55 (1969). Of course, an action for personal injury cognizable in admiralty may also be brought, assuming the existence of some independent jurisdictional base like diversity of citizenship, as a civil suit pursuant to the "savings to suitors" clause of 28 U.S.C. § 1333. (emphasis added).
 
 
 73
 Id. at 1252.
 
 
 74
 Romero demonstrates that by electing to proceed under 9(h) rather than by invoking diversity jurisdiction, the plaintiff may preclude the defendant from invoking the right to trial by jury which may otherwise exist. The Advisory Committee's Notes to Rule 9(h) evince a similar conclusion, and, because we feel that the election made available to the pleader pursuant to Rule 9(h) is dispositive of the contention made by Rohm and Haas, we find it necessary to quote briefly from the Notes.
 
 
 75
 Many claims, however, are cognizable by the district courts whether asserted in admiralty or in a civil action, assuming the existence of a nonmaritime ground of jurisdiction. Thus at present the pleader has (the) power to determine procedural consequences by the way in which he exercises the classic privilege given by the saving-to-suitors clause (28 U.S.C. § 1333) or by equivalent statutory provisions. For example, a longshoreman's claim for personal injuries suffered by reason of the unseaworthiness of a vessel may be asserted in a suit in admiralty or, if diversity of citizenship exists, in a civil action. One of the important procedural consequences is that in the civil action either party may demand a jury trial, while in the suit in admiralty there is no right to jury trial except as provided by statute. . . . The unified rules must therefore provide some device for preserving the present power of the pleader to determine whether these historically maritime procedures shall be applicable to his claim or not ; the pleader must be afforded some means of designating his claim as the counterpart of the present suit in admiralty, where its character as such is not clear. . . . Other methods of solving the problem were carefully explored, but the Advisory Committee concluded that the preferable solution is to allow the pleader who now has power to determine procedural consequences by filing a suit in admiralty to exercise that power under unification, for the limited instances in which procedural differences will remain, by a simple statement in his pleading to the effect that the claim is an admiralty or maritime claim. (emphasis added).
 
 
 76
 Fed.R.Civ.P. 9(h), Advisory Committee Note, 39 F.R.D. 69, 75-76 (1966).
 
 
 77
 In the case at bar, the plaintiff has elected to proceed against both the vessel and the shipper, Rohm and Haas, pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, with the attendant right to a non-jury trial. That the third-party claim filed by the stevedore was labeled as being asserted pursuant to Rule 14(a), rather than 14(c), is of no consequence for several reasons. First, we refuse to permit a third-party defendant to emasculate the election given to the plaintiff by Rule 9(h) by exercising the simple expedient of bringing in a fourth-party defendant.[33] Second, the fourth-party complaint is based upon the same set of operative facts which gave rise to the first complaint. That is, the facts which established admiralty jurisdiction for the plaintiff's original claim, injury upon navigable waters performing a task traditionally performed by seamen, also forms the basis for the fourth-party action. See Watz v. Off-Shore Co., 431 F.2d 100, 118 (5th Cir. 1970); Sanchez v. Loyd W. Richardson Construction Corp., 56 F.R.D. 472 (S.D.Tex.1972). See also Banks v. Hanover Steamship Corp., 43 F.R.D. 374, 380-382, nn. 8, 9 (D.Md.1967). Third, the plaintiff amended his complaint to state a claim directly against Rohm and Haas, the fourth-party defendant. In the amended pleading the plaintiff specified that the claim is brought pursuant to Rule 9(h). Furthermore, this case is clearly distinguishable from McCrary v. Seatrain Lines, Inc., 469 F.2d 666 (9th Cir. 1972). In McCrary, the court noted that the third-party claim was ancillary to the plaintiff's diversity claim and did not lie solely in admiralty. In the case at bar, the plaintiff has not alleged diversity as an alternative basis of jurisdiction.
 
 
 78
 We therefore specifically reject Oroco Marine, Inc. v. National Marine Service, Inc., 71 F.R.D. 220 (S.D.Tex.1976), wherein the district court held that "(t)he third-party defendant's entitlement to a trial by jury depends upon the nature of the jurisdictional power, if any, which the Court has over the third-party action, and, if multiple jurisdictional grounds exist, whether or not the third-party plaintiff has labelled its action as a maritime and admiralty claim within the meaning of Rule 9(h), Fed.R.Civ.P." Id. at 221.
 
 
 79
 Nor does the holding of the Supreme Court in Fitzgerald v. United States Lines Co., 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963), impel us to conclude that Rohm and Haas is entitled to a jury trial. In Fitzgerald, the plaintiff seaman sued under the Jones Act and for failure to provide medical attention, maintenance, and cure. The trial court granted the plaintiff's jury demand on the Jones Act claim,[34] but heard the maintenance and cure claim itself. The Supreme Court held that when a claim under the Jones Act and a claim for maintenance and cure arise from the same operative facts, in the interest of fairness and judicial economy the plaintiff is entitled to have both claims tried together to the jury. In Fitzgerald, the plaintiff specifically elected to pursue his Jones Act claim, with the attendant right to trial by jury. In the case at bar, the plaintiff has specifically elected to pursue a non-jury admiralty claim pursuant to Rule 9(h). The trial court therefore correctly denied the demand of Rohm and Haas for a jury trial.
 
 C. Pre-Judgment Interest
 
 80
 The award of pre-judgment interest in admiralty cases is committed to the sound discretion of the trial court. Haynes v. Rederi A/S Aladdin, 362 F.2d 345 (5th Cir. 1966), cert. denied, 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557 (1967). We find nothing in this record, including the five year period between injury and trial and the fourteen month period between trial and judgment, which would lead to the conclusion that the trial court abused its discretion in awarding pre-judgment interest. Rohm and Haas does not contend that the rate of interest (6%) imposed is excessive, and we certainly would not so hold.
 
 CONCLUSION
 
 81
 The trial court was not clearly erroneous in finding that exposure to IBA caused the plaintiff's injury, and that the warning given by Rohm and Haas negligently failed to warn of the danger which may be involved from the inhalation of IBA fumes. The finding of the trial court that Flanagan Stevedores was not actively negligent in the conduct of the clean up operation is clearly erroneous, however, and such negligence caused the plaintiff to be exposed to IBA on his skin and clothing.[35] Because the trial court found that the plaintiff was exposed to IBA by inhalation of fumes and skin contact, but failed to determine which source of exposure, or both, caused the plaintiff's injury, it is necessary to remand this case for further factual findings.[36]
 
 
 82
 As to the liability of Rohm and Haas, it will also be necessary for the trial court to make an additional factual finding. The trial court must determine whether the failure of the Flanagan supervisory personnel to read the warning until after the plaintiff had descended into the hold negates the inadequate warning as the cause-in-fact of the plaintiff's injury, or whether sufficient exposure to the fumes occurred after the warning was read so that liability may be properly placed upon Rohm and Haas regardless of the delayed nature of the reading. We further conclude that the trial court did not commit error in denying the request of Rohm and Haas for trial by jury, and did not abuse its discretion in awarding pre-judgment interest.
 
 
 83
 On remand, the trial court may conduct such proceedings and take such testimony, if any, which it may deem necessary. We in no way imply that a new trial, in whole or in part, is required.
 
 
 84
 REMANDED.
 
 
 
 [1]
 Isobutyl acrylate is an industrial chemical used in the manufacture of plastics, latex paints, synthetic rubber, lacquer, and varnish. It is a highly reactive substance, readily reacting with amines, fats, and proteins, and will react with itself unless accompanied by an inhibitor during shipment. It is strong smelling and is known to cause burning and itching of the eyes, nose, and throat, but because it is not easily soluble in body fluids it does not readily penetrate the skin layers or other tissues. R.Vol. III, 486
 
 
 [2]
 It was proper for the plaintiff to assert an unseaworthiness claim against the vessel owner and for the vessel owner to seek indemnity from the employer because the operative facts giving rise to this suit occurred prior to the effective date of the 1972 amendment to 33 U.S.C. § 905. See Hess v. Upper Mississippi Towing Corp., 559 F.2d 1030, 1032 (5th Cir. 1977) for a discussion of the changes in the law occasioned by the 1972 amendment of § 905
 
 
 [3]
 Although not significant for the purpose of this appeal, the trial court also awarded judgment in the amount of $10,368.25, plus interest, to Texas Employers Insurance Association, which intervened in the case. This award represented the compensation lien which the Association possessed by virtue of the payments made to the plaintiff
 
 
 [4]
 29 C.F.R. § 146.25-10
 
 
 [5]
 Rohm and Haas may therefore be held liable regardless of whether IBA is a Class B poison within the meaning of the Coast Guard regulations
 
 
 [6]
 We are mindful that there is conflicting testimony in the record, even from the plaintiff, as to the amount of time the plaintiff spent in the hold and the quantity of IBA spilled onto his body and clothing. We are unable to conclude from this record, however, that the testimony of the plaintiff was so "inherently incredible" that it should be disregarded entirely. See Southern Pacific Co. v. Matthews, 335 F.2d 924, 927 (5th Cir. 1964). Rohm and Haas concedes that "normally, it would not be clearly erroneous for the trial judge to totally disregard all conflicting evidence and all inconsistent statements by the plaintiff and to accept only his trial testimony as fact." Brief of Appellant at 18. It is not disputed by Rohm and Haas that the plaintiff did spend some time, at least forty-five minutes, in the fume-filled hold. The plaintiff's testimony that the liquid was spilled onto his clothing was corroborated by the testimony of Mr. Stevenson McClendon, a longshoreman present on the date of the incident. Supp.R.Vol. I, 53, 55, 56, 61. Under these facts, we simply cannot hold that the plaintiff's trial testimony that he was in the hold for approximately forty-five minutes to an hour and that IBA spilled onto his clothing is "inherently incredible."
 
 
 [7]
 Physiology is the study of how the body functions and the various biochemical and physical events which cause the body to function under normal conditions
 
 
 [8]
 Toxicology is the study of poisons and their effects on living organisms
 
 
 [9]
 Pharmacology is the study of drugs
 
 
 [10]
 Dr. Jenkins acknowledged that Dr. Jones "trained under" him and that Dr. Jones "would understand the significance of digital clubbing." Supp.R.Vol. VI, 1628-1630
 
 
 [11]
 For an excellent review of the pertinent cases dealing with the issue of the applicability of federal maritime law, see Edynak v. Atlantic Shipping Inc. cie. Chambron Maclovia S.A., 562 F.2d 215 (3rd Cir. 1977), wherein the Court held that even in a case based upon diversity of citizenship, federal maritime law is to be applied when the injury occurs on navigable waters and when some connection to traditional maritime activity is demonstrated. See also Executive Jet Aviation v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); Drachenberg v. Canal Barge Co., Inc., 571 F.2d 912, 916-917 (5th Cir. 1978); Kelly v. Smith, 485 F.2d 520 (5th Cir. 1973)
 We are mindful of our recent holdings in Gay v. Ocean Transport & Trading Ltd., 546 F.2d 1233 (5th Cir. 1977), and Hess v. Upper Mississippi Towing Corp., 559 F.2d 1030 (5th Cir. 1977). In Gay, we held that negligence actions under § 905 brought after the 1972 amendment are to be governed primarily by land-based law concepts. Our conclusion that land-based law, with certain exceptions not applicable here, is to govern third party actions brought under § 905 was based primarily upon the legislative history underlying the 1972 amendment. This legislative history is adequately recounted in Gay and will not be repeated here. In resorting to land-based concepts in Gay, we looked to the Restatement of Torts for guidance.
 In Hess, we noted that the legislative history of the 1972 amendment of § 905 "discloses an intent that the negligence action be a matter of uniform federal law, and, with certain exceptions, be designed to give the maritime worker the same rights against third parties as his land-based counterparts would have." 559 F.2d at 1032. We then flatly held as follows:
 General maritime law no longer governs third party actions by maritime workers except to the extent that the maritime concepts have an analogy in land-based law. For instance, the Committee expressly intended that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence would apply, and that the admiralty rule precluding 'assumption of risks' as a defense would be applicable. But these concepts are not exclusively maritime, and do not alter the fact that general maritime law, as such, does not control outcome of these third party actions.
 Id. at 1032-33.
 Gay and Hess do not affect our conclusion that general maritime law is applicable in this case because suit was filed prior to the enactment of the 1972 amendment. In any event, application of Texas law would not affect the decision which we ultimately reach in this case.
 
 
 [12]
 See Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1088, 1093 (5th Cir. 1973)
 
 
 [13]
 The record indicates that Dow Badische commonly uses the language "Avoid Breathing Vapor" when shipping IBA. Plaintiff's Exhibit 33; Supp.R.Vol. II, 478
 
 
 [14]
 Dr. Dernehl did acknowledge, however, that other physicians on the Union Carbide staff have on a few occasions received complaints. Supp.R.Vol. IV, 1022
 
 
 [15]
 We refer to the issue of whether the cause of the plaintiff's condition was the inhalation of fumes or skin exposure to IBA, or both
 
 
 [16]
 The finding of the trial court that the stevedore was not negligent in the operation of the winch renders it unnecessary to reach the issue of whether the dropping of the barrel was the proximate cause of the plaintiff's injury. It is elementary that "proximate cause" or "legal cause" analysis need only be undertaken if the court finds that the defendant has been negligent. Spinks v. Chevron Oil Co., 507 F.2d 216, 222 (5th Cir. 1975)
 
 
 [17]
 29 C.F.R. § 1504.103(a) can now be found in identical form at 29 C.F.R. § 1918.103(a)
 
 
 [18]
 Nor can Flanagan Stevedores find solace in the contention that although it could foresee that skin irritation may result from the failure to provide protective clothing, it could not foresee that the plaintiff would contract pulmonary fibrosis and emphysema. The negligent actor need not foresee the exact nature of the injury which his negligent conduct may engender but must take the plaintiff as he finds him, with his existing medical propensities. See Petition of Kinsman Transit Co., 338 F.2d 708, 724 (2nd Cir. 1964)
 
 
 [19]
 See Spinks v. Chevron Oil Co., 507 F.2d 216, 223 (5th Cir. 1975)
 
 
 [20]
 The trial court's Findings of Fact and Conclusions of Law seems to indicate that inhalation of the fumes is the more likely cause of the plaintiff's injury. The court found that IBA is a "highly boiling ester which means that it is not easily soluble in body fluids so that it does not readily penetrate the skin layers or other tissues." (emphasis added). R. Vol. III, 486. The court also stated that the plaintiff "had no reason to think that the discomfort he was suffering from breathing the IBA fumes, no greater discomfort than he had suffered in the past from other substances, could be a danger to his health or his life." (emphasis added). Id. at 487. Additionally, the court concluded that the warning could have misled plaintiff and others to think that breathing the fumes for a short time would not be harmful. Id. at 492. Nevertheless, the trial court does not dismiss skin exposure as a cause of the plaintiff's injury and we therefore refuse to do so on appeal
 
 
 [21]
 In Ryan, the Supreme Court held that if the employee recovers against the vessel owner on the ground of unseaworthiness, and the unseaworthy condition was caused by the failure of the stevedore employer to perform his work in a workmanlike fashion, the vessel owner is entitled to indemnity from the stevedore employer. Similarly, in Tri-State, we held that the vessel owner was entitled to indemnity from an actively negligent service contractor, assuming that the vessel owner was not also actively negligent. We remanded the case for a factual determination of whether the vessel owner was actively negligent
 
 
 [22]
 The plaintiff amended his complaint to state a claim directly against Rohm and Haas
 
 
 [23]
 If the negligence of Flanagan Stevedores is found to be the sole cause of the injury, which we believe is unlikely, liability should be imposed against the vessel owner with right of indemnification from Flanagan
 
 
 [24]
 See Prosser, Law of Torts 247 (3rd ed. 1964)
 
 
 [25]
 46 C.F.R. § 146.25-10
 
 
 [26]
 46 C.F.R. § 146.06-14 et seq
 
 
 [27]
 46 C.F.R. § 146.05-17
 
 
 [28]
 See Prosser, Law of Torts 240 (3rd ed. 1964)
 
 
 [29]
 See also Chavez v. Noble Drilling Corp., 567 F.2d 287 (5th Cir. 1978), involving a tort action not based in whole or in part upon the Jones Act
 
 
 [30]
 See n. 11, infra
 
 
 [31]
 Rule 9(h) provides:
 Admiralty and maritime claims. A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 38(e), 82, and the Supplemental Rules for Certain Admiralty and Maritime Claims. If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not. The amendment of a pleading to add or withdraw an identifying statement is governed by the principles of Rule 15. The reference in Title 28 U.S.C. § 1292(a)(3) to admiralty cases shall be construed to mean admiralty and maritime claims within the meaning of this subdivision (h).
 
 
 [32]
 Rules 14(a) and (c) provide as follows:
 (a) When Defendant may Bring in Third Party. At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him. The third-party plaintiff need not obtain leave to make the service if he files the third-party complaint not later than 10 days after he serves his original answer. Otherwise he must obtain leave on motion upon notice to all parties to the action. The person served with the summons and third-party complaint, hereinafter called the third-party defendant, shall make his defenses to the third-party plaintiff's claim as provided in Rule 12 and his counterclaims against the third-party plaintiff and cross-claims against other third-party defendants as provided in Rule 13. The third-party defendant may also assert any claim against the plaintiff arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff. The plaintiff may assert any claim against the third party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff, and the third-party defendant thereupon shall assert his defenses as provided in Rule 12 and his counterclaims and cross-claims as provided in Rule 13. Any party may move to strike the third-party claim, or for its severance or separate trial. A third-party defendant may proceed under this rule against any person not a party to the action who is or may be liable to him for all or part of the claim made in the action against the third-party defendant. The third-party complaint, if within the admiralty and maritime jurisdiction, may be in rem against a vessel, cargo, or other property subject to admiralty or maritime process in rem, in which case references in this rule to the summons include the warrant of arrest, and references to the third-party plaintiff or defendant include, where appropriate, the claimant of the property arrested.
 (c) Admiralty and Maritime Claims. When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff.
 
 
 [33]
 Judge Oliver J. Carter, District Judge for the Northern District of California, in a well reasoned opinion, refused to permit a defendant to emasculate the 9(h) election by filing a permissive counterclaim pursuant to Rule 13(b) alleging a violation of the antitrust laws. Alaska Barite Co. v. Freighters, Inc., 54 F.R.D. 192 (N.D.Cal.1972). Judge Carter, however, did exercise his discretionary power of granting a separate trial on the antitrust claim pursuant to Rules 42(b) and 13(i)
 
 
 [34]
 A Jones Act plaintiff is given the right to trial by jury by statute. 46 U.S.C. § 688
 
 
 [35]
 We are mindful that some skin exposure probably occurred during removal of the first barrel, prior to the time that the warning was read by the Flanagan supervisory personnel. The record, however, would certainly support a finding that skin exposure occurred after the warning was read
 
 
 [36]
 We need not reach the issue of whether the plaintiff may recover on a strict liability theory because we have determined that the plaintiff may recover from one or more of the defendants on the theory of negligent failure to warn